UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
NELSON A. MURRAY,                                                       :

                Plaintiff,                                    :

     - against -                                                           **COMPLAINT AND**
                                          :  **JURY DEMAND**

THE DUTCHESS COUNTY DEPARTMENT OF                    **CIVIL NO.**
PUBLIC WORKS, ROBERT BALKIND Commissioner, :
in his official and individual capacities,
DAVID WHALEN, Deputy Commissioner, in his              :
official and individual capacities, GARY COOPER, in
his official and individual capacities, MATHEW
DUTCAVICH, in his official and individual capacities.
Defendants.
------------------------------------------------------------------X

      Plaintiff, NELSON A. MURRAY as and for his Complaint and Jury Demand, through his

counsel, Deirdra Jeneva Brown alleges as follows:

## NATURE OF THE ACTION

    1.      This is an action for back pay, compensatory and punitive damages, proximately

caused by Defendants' violation of Plaintiff's rights as guaranteed by 42 U.S.C. §§2000e et seq.

(hereinafter "Title VII"), 42 U.S.C. §§ 1981 and 1983 (hereinafter "Sec.1981" and "Sec.1983")

and New York State Executive Law §296 et seq. (hereinafter the "New York State Human Rights

Law" or "NYSHRL").

## THE PARTIES

    2.   NELSON ARNOLD MURRAY ("Mr. Murray" or "Plaintiff") is a dark-brown skinned,

African-American man.  Mr. Murray resides on South Grand Avenue in Poughkeepsie, New York.

At all times relevant to this complaint, Mr. Murray was employed or previously employed as an

Engineering Aide or a Senior Engineering Aide in the Engineering Division of the Department of Public Works for Dutchess County, New York.

3.    The Dutchess County Department of Public Works (hereinafter "DPW") constructs, repairs and maintains highways, bridges and public works facilities located throughout Dutchess county. The DPW has its main site at 626 Dutchess Turnpike, Poughkeepsie, New York 12603. Mr. Murray qualifies as an "employee" of defendant DPW as that term is defined in Title VII, Sec.1981 and the NYSHRL.

4.    At all times relevant, defendant ROBERT BALKIND, a Caucasian male, was and continues to be an employee of defendant DPW. BALKIND's office is located at defendant DPW's main site on Dutchess Turnpike in Poughkeepsie, New York.    Defendant BALKIND is the Commissioner and the chief administrative officer of defendant DPW.    As chief administrative officer, BALKIND has the authority to hire and fire County employees.

5.    At all relevant times, defendant DAVID WHALEN, a Caucasian male, was and continues to be an employee of defendant DPW. Defendant WHALEN's office is located at defendant DPW's main site on Dutchess Turnpike in Poughkeepsie, New York.    Defendant WHALEN is the Deputy Commissioner of defendant DPW.    As the deputy commissioner, WHALEN takes direction from the Commissioner, and has derivative authority to hire and fire County employees.

6.    At all relevant times, defendant GARY COOPER, a Caucasian male, was and continues to be an employee of defendant DPW. Defendant COOPER's office is located at defendant DPW's main site on Dutchess Turnpike in Poughkeepsie, New York.    Defendant COOPER is the Director of Highway Construction and maintenance for defendant DPW.    Defendant COOPER takes

Page 2 of  23

direction from the Commissioner and the Deputy Commissioner, and has derivative authority to hire and fire County employees.

7.    At all relevant times, defendant MATHEW DUTCAVICH, a Caucasian male, was and continues to be an employee of defendant DPW.  Defendant DUTCAVICH holds the title Assistant Civil Engineer II.

8.    At all relevant times, defendants BALKIND, WHALEN, COOPER AND DUTCAVICH had supervisory authority over the Plaintiff and/or  had authority and/or had the  power to hire, fire and otherwise affect, and did adversely affect the terms and conditions of Plaintiff's employment with defendant DPW.  Defendants' adverse actions were discriminatory, retaliatory and otherwise constitute unlawful employment practices based upon and because of plaintiff's race and/or color and/or because plaintiff opposed discriminatory and unlawful employment practices in the workplace, and/or participated in proceedings in opposition to such practices.  Such adverse actions are the subject of this Complaint and Jury Demand.

### JURISDICTION

9.    The Court's jurisdiction over Plaintiff's Federal claims is invoked pursuant to 28 U.S.C. §§1331, 1343. Supplemental jurisdiction over the New York State claims is invoked pursuant to 28 U.S.C. §1367.   All claims stem from a common nucleus of operative facts.

10.    As regards Plaintiff's Title VII claims; on August 23, 2017, the EEOC without making any findings on the merits, issued plaintiff a notice of right to sue.  Plaintiff received that notice on or about August 30, 2017.  The instant action is filed well within the applicable ninety (90) day limitations period.

11.    Pursuant to New York State County Law Section 52, Plaintiff duly served defendants

with a Notice of Claim ("NOC") on September 24, 2017. [Ex.5]  The NOC was served within the ninety (90) day limitations period, and at least thirty (30) days have elapsed since service of such notice.  Defendants have neglected or refused to make the payment or adjustment requested in the notice of claim, and the instant action has been commenced within one year and ninety days of the event upon which the claims at issue are based.  *See, NYS County Law §52, NYS General Municipal Law §50-e, NYS General Municipal Law §50-I.*

12.    Venue in the United States District Court for the Southern District of New York is proper pursuant to 28 U.S.C. §1391 et.seq.

## FACTUAL AVERMENTS

13.    Nelson Arnold Murray, age 49 year old, is an African-American man with dark-brown skin.

14.    In or about February 2007, the DPW hired Mr. Murray as a Senior Engineering Aide, at an annual salary of approximately $37,000.00 a year.

15.    Mr. Murray came to DPW with ten years of experience as a Highway Construction Inspector.  He holds a Level III certification from the National Institute of Certified Engineering Technicians ("N.I.C.E.T."), in Heavy Highway Construction, and a certificate from the American Concrete Institute in Concrete Field Testing, Grade I.

16.    Mr. Murray's duties as a Senior Engineering Aide at DPW included inspecting highway construction sites, assisting the professional engineers with data collection related to highway construction, monitoring erosion and waterways, and responding to residential complaints.  Mr. Murray's regular shift began at 8:00 a.m. and ended at 4:00 p.m. each day, Monday through Friday.  His position also afforded him the opportunity to work overtime and earn overtime pay as needed.

17.    At all times relevant to this complaint, Mr. Murray's work performance as a senior engineering aide was in all ways exemplary.

18.    Mr. Murray was generally regarded by his co-workers and supervisors as a hard worker, and a gentleman.

19.    In a letter to Commissioner Balkind dated May 26, 2015, a Dutchess County Resident paid Mr. Murray a compliment.  She described him as "kind, efficient and attentive."  In a subsequent meeting at which Commissioner Balkind, and the County's Deputy Commissioner were present, the Deputy Commissioner diminished the resident's compliment by asking plaintiff if perhaps he were giving the resident "sexual favors."

20.    The engineering division of DPW had approximately 15 employees.  In the ten years of Mr. Murray's employ, only one other African-American employee worked in the Engineering Division.  Like Mr. Murray, the other African-American employee held the position of Senior Engineering Aide for thirty years without a promotion and, upon information and belief, filed legal action against DPW alleging race discrimination.

21.    In 2004, Mr. Murray applied to DPW for the position of Junior Civil Engineer.   Upon information and belief, DPW hired two Junior Civil Engineers that year, both of whom were Caucasian.   Mr. Murray was not hired.

22.    In or about 2008, DPW scheduled a promotional exam in preparation for elevating an employee from within to the position of Junior Civil Engineer.  Mr. Murray spoke with the director of engineering who discouraged him from taking the exam to qualify for the promotion; telling him that "it was not his time."  Vascily Shatalov, a Caucasian male,  took the qualifying exam however, and was promoted to the position of Junior Civil Engineer.   At the time Mr. Murray had more than

ten years of work experience compared to Shatalov's two years with the department.

23.    In 2011, Mr. Murray took and passed the qualifying exam for the position of Junior Civil Engineer.

24.    In May, 2015, Mr. Murray wrote to Commissioner Balkind to make clear his interest in advancing beyond the position of Senior engineering Aide.  Mr. Murray attached a list of approximately thirty (30) Dutchess County projects on which he had successfully served in the role of Construction chief Inspector.

25.    In 2015, Mr. Murray submitted a request to have his position reclassified from that of "Senior Engineering Aide" to that of "Junior Civil Engineer."  Mr. Murray performed the duties of a Junior Civil Engineer, and simply wanted his title to reflect his actual duties and responsibilities;

26.    Mr. Murray submitted his request for reclassification through proper channels. Regulations dictate that employees who submit a request for reclassification, are entitled to a response from DPW within thirty (30) days.  DPW did not respond to Mr. Murray's request for reclassification.

27.    Having received no response from DPW by the end of thirty (30) days, Mr. Murray inquired with Human Resources about the status of his reclassification request.

28.    Personnel officer Richard Wiands told Mr. Murray that the reclassification request had "fallen through the cracks."  DPW did not follow up and Mr. Murray received no further communication from DPW about his request.

29.    Beginning in or about February, 2017, the DPW started a major bridge rehabilitation project entitled "PO-15X."  The PO-15X rehabilitation project was the largest project under way in the Engineering Division at that time.  The contract for completing the work had been awarded

to Bette & Cring Construction Group, Steve Butler Project Manager.   Butler, as contractor, was required by contract to provide and maintain a work-site trailer for the County DPW inspector to use. The trailer needed to be equipped with reliable power to provide lights, heat and air; and a dedicated bathroom facility for the DPW inspector assigned to work at the site.   Further, the on site inspector needed access to a reliable internet signal so that data and inspection reports prepared on site could be uploaded to the DPW system.

30.    DPW assigned Mr. Murray to be the field inspector on the PO-15X project.  As Mr. Murray was an "Aide" and not an "Engineer," he was assigned to work under the supervision of defendant Mathew DUTCAVICH, Assistant Civil Engineer II.

31.    There were problems at the work site from the beginning.   The contractor, Bette and Cringe Construction, failed to put a field trailer in place until approximately two months into the project.  Once the trailer was in place, Mr. Murray found that it did not have a reliable, continuous source of electrical power, bathroom facilities or a reliable internet signal.

32.    Mr. Murray complained repeatedly to Mathew DUTCAVICH that the work-site deficiencies were interfering with his ability to complete and submit timely reports.  As the supervisory engineer, it was DUTCAVICH's responsibility to bring the contractor into compliance with his obligations under the contract.  Further DUTCAVICH had personal knowledge of the work-site  trailer-deficiencies as he experienced the problems during progress meetings with Mr. Murray held at the trailer on alternating Wednesdays.  During these meetings, Mr. Murray had to prop open the field trailer door so that there would be enough light to conduct the meeting.

33.    Despite Mr. Murray's repeated complaints, the work-site trailer-deficiencies were not corrected.  Mr. Murray, with DUTCAVICH's permission, began to use the bathroom facilities at his

home during his lunch hour, and began to use the computer at the DPW main site to complete his reports during after-work hours.

34.    Mr. Murray told DUTCAVICH that it wasn't fair that other field inspectors had work trailers that were compliant.  Upon information and belief, the field trailers of other County inspectors, all of whom were Caucasian, had continuous power, reliable internet connections and a well maintained bathroom facility.  Mr. Murray told DUTCAVICH that the disparity in treatment was discriminatory.

35.    On or about April 3, 2017, Mr. Murray met with the Dutchess County EEO Officer, Jody Miller.  Mr. Murray's meeting with EEO lasted approximately an hour and a half.

36.    During the meeting with EEO, Mr. Murray told the EEO Officer that he believed DPW treated him differently because of his race.  Mr. Murray described the deficiencies in his work-site trailer, and told the EEO officer that the deficient trailer was just the most recent episode in a pattern of discriminatory incidents spread out over his ten years of employment with the DPW.

37.    Mr. Murray told Ms. Miller that he was passed over for a promotion in the past and that he believed it was because of his race. He described how his request for reclassification from a Senior Engineering Aide to a Junior Civil Engineer had "fallen through the cracks" and was never considered.   He complained that the Engineering Division of the DPW did not hire or promote African-Americans to the position of Junior Civil Engineer.

38.    On or about April 10, 2017, little more than a week after Mr. Murray complained of discrimination to the County's EEO Officer, defendant DUTCAVICH spoke to Mr. Murray about his practice of returning to the main site to complete work reports.  DUTCAVICH told Murray that he would no longer be permitted to work past his regularly scheduled hours.  DUTCAVICH issued

this restriction even though he knew of the ongoing problems with the PO-15X project work-site trailer.

39.    On April 14, 2017, within days of instructing Mr. Murray NOT to work additional hours, DUTCAVICH wrote a memo to Murray *authorizing* additional hours.

40.    DUTCAVICH copied the April 14th memo to Commissioner BALKIND.

41.    DUTCAVICH falsely implied in the April 14th memo that Mr. Murray was having trouble "keep[ing] up with report writing."  Mr. Murray was NOT having trouble keeping up with his report writing duties, despite the deficiencies with his field trailer.  Further DUTCAVICH's memo made no mention of the deficiencies with the PO-15X field trailer which made the additional hours at the main-site necessary.

42.    In his memo DUTCAVICH further attributes the following statement to Mr. Murray:

> "During this discussion, you stated that working additional hours beyond your base hours *might be problematic at times for several reasons, including levels of job stress, conflicts with your personal schedule outside of work, age, and lack of a set schedule to plan around."*

43.    Mr. Murray never told DUTCAVICH that working additional hours beyond his base hours would be "problematic."  Mr. Murray never told DUTCAVICH that working additional hours would cause "job stress," or "conflict with [his] personal schedule."  Mr. Murray never mentioned his age to DUTCAVICH for any reason.  Mr. Murray did not complain to DUTCAVICH that additional hours would deprive him of "a set schedule to plan around."

44.    DUTCAVICH's memo was a complete fabrication.

45.    DUTCAVICH drafted and circulated this memo to the Commissioner of DPW within two weeks of Mr. Murray's complaints of discrimination to the County's EEO officer.

46.    On Sunday, April 23, 2017, Mr. Murray mailed an intake and formal complaint to the EEOC in New York, New York.  The Complaint accused DUTCAVICH, BALKIND and DPW in general with discrimination and other unlawful employment practices.

47.    Mr. Murray circulated the EEO complaint to defendants DUTCAVICH, BALKIND and two Union representatives by certified mail.

48.    On Monday, April 24, 2017, at the end of the day, Mr. Murray returned to the DPW main-site after work to find a letter placed at his workstation.  The letter was inside an envelop that bore Mr. Murray's home address, but the envelope bore no markings indicating that the letter had ever been sent through the mail.

49.    The letter was dated "April 20, 2017," and signed by Commissioner BALKIND.

50.    In the April 20th letter, defendant BALKIND claimed that he had received a "report and photographs" alleging that Mr. Murray's county vehicle had been seen parked at his home during the work day.

51.    In the April 20th letter, BALKIND summoned Mr. Murray to attend a meeting scheduled for April 27, 2017

52.    In ten years of exemplary service at DPW, Mr. Murray had never been summoned to a meeting for any reason.  Mr. Murray had never been counseled, warned or issued a reprimand for misconduct of any kind, nor had he ever received a less than satisfactory performance evaluation.

53.    The April 14th and the "April 20th" letters were both issued within days of Mr. Murray's meeting with the County EEO officer where he complained of workplace discrimination.

54.    Believing BALKIND and DUTCAVICH to be targeting him, and in fear of losing his job, Mr. Murray became increasingly anxious and depressed; and could not sleep.  He did not report

for work on April 25, 2017.

55.    In an email sent to BALKIND and DUTCAVICH the morning of April 26, 2017, before Mr. Murray reported to work, Mr. Murray described in detail his reasons for believing that Commissioner BALKIND and Mathew DUTCAVICH had discriminated against him over the years, and were retaliating against him with the April 14th and April 20th letters because of his meeting with the EEO officer.

56.    Mr. Murray arrived at work early on April 26th, not having slept the night before. He saw BALKIND standing with two sheriff's deputies in the county office parking lot.  His colleagues had not come into work yet and Mr. Murray was alone in the office. As Balkind lingered in the parking lot with armed sheriff's deputies, Mr. Murray began having trouble concentrating.  Seeing clear evidence of an escalating pattern of retaliation against him over the past three weeks; he did not trust BALKIND's motives for lingering in the parking lot with armed officers. The retaliation against Murray to that point had included false statements about him, deliberately manufactured by DUTCAVICH; alleged anonymous surveillance of him and allegations that he misused county property. As Mr. Murray sat watching Balkind and the Sheriff's deputies, he became concerned for his safety. He left the office, went home and called in sick.  He left a voice message on the office recorder telling BALKIND  that he would not return to work until the situation between them had been resolved.

57.    Later that day, Mr. Murray reached out to his union representative, shop steward James Dewitt.  Dewitt and Murray spoke by phone.  Dewitt told Murray that he (Dewitt) had spoken with "the County." Dewitt stated that he learned from "the county" that Mr. Murray's EEO complaint would be submitted to the County EEO officer. Dewitt then told Mr. Murray that the Union could

not represent Murray at the meeting scheduled for the following day. Dewitt told Mr. Murray that because Mr. Murray had filed an EEO against DUTCAVICH, the union would have to represent DUTCAVICH.

58.    With no union representation, and in fear of further retaliation and harassment, Mr. Murry did not attend the scheduled meeting with BALKIND on April 27, 2017.

59.    When Mr. Murray did not show, BALKIND promptly issued Mr. Murray a letter warning him that he had exhausted his paid leave and that if he did not return to work on Friday, April 28, 2017, his pay would be docked.

60.    BALKIND's April 27th letter ignored Mr. Murray's expressed concerns about discriminatory harassment and retaliation. BALKIND does not acknowledge in the April 27th letter that Mr. Murray viewed BALKIND and DUTCAVICH as the *source* of the discriminatory harassment and retaliation.

61.    In the April 27th letter, BALKIND acknowledges receiving an "email, voice mail and written correspondence" from Mr. Murray. BALKIND makes reference to Mr. Murray's "stress", "distraction" and "anxiety" in the letter, and directs Murray to seek counseling with the County Employee Assistance Program, off-handedly suggesting that Murray had a personal problem.

62.    On May 10, 2017, Mr. Murray mailed a grievance request to his union. In his grievance Mr. Murray repeated, in detail, the discrimination, harassment and retaliation he had complained of on April 3rd and on April 23rd. Mr. Murray copied the grievance request to BALKIND and to DUTCAVICH by certified mail and by Email.

63.    On May 14, 2017, Mr. Murray emailed BALKIND a written response to BALKIND's April 27th letter in which BALKIND had threatened to dock Murray's pay. Murray's May 14,2017

letter again charged BALKIND and DUTCAVICH with discriminatory harassment, and retaliation, directly putting BALKIND on notice of protected activity for the third time.

64.    On May 15, 2017, the retaliatory harassment against Mr. Murray escalated.  BALKIND arranged to have Deputy Commissioner David WHALEN "witness" an exchange between Murray and BALKIND so that WHALEN could later testify as a "witness" to a charge of insubordination against Mr. Murray.

65.    When Mr. Murray arrived at work on the morning of May 15, 2017, BALKIND shouted to Murray to come into his office.  BALKIND and WHALEN had previously agreed that BALKIND would call out to Murray so that WHALEN could hear the exchange.  BALKIND, knowing that Mr. Murray would refuse the invitation wanted WHALEN to be able to testify as a "witness" to a charge of insubordination.   At a hearing heled June19, 2017, WHALEN testified according to plan.

66.    On May 15, 2017, BALKIND through his secretary Theresa Chiarello, summoned Mr. Murray to come to the main-site after work to pick up a meeting notice.

67.    On the morning of May 16, 2017, Deputy Commissioner David WHALEN approached as Mr. Murray arrived to the main-site for work.  WHALEN "shoved" and "jabbed" a meeting notice between Murray's ring and middle finger.  WHALEN told Mr. Murray to "take it!"

68.    At or about 3:30pm on May 19, 2017, BALKIND,  accompanied by two armed sheriff's deputies, an off duty Captain, and a fourth man waited for Nelson Murray in the parking lot of the Dutchess County DPW.   The two sheriff's deputies surrounded Mr. Murray's assigned vehicle, demanded his car keys and equipment, stuffed a "notice of charges" in his safety vest and ordered him off of County Property.

69.    BALKIND had signed the notice which preferred four counts of insubordination against

Mr. Murray, and proposed Mr. Murray's termination.

70.     BALKIND based each count upon a separate instance of Mr. Murray refusing to pick-up a meeting notice or to attend a scheduled meetings between April 27, 2017 and May 19, 2017. [Tr.p53:7-18]

71.     BALKIND and DPW abandoned all spurious claims that Mr. Murray had improperly used a county car, exhausted his paid leave benefits, or complained of  "job stress", "personal schedule" issues, "age," or the "lack of a set schedule." [Tr. 55-56]

72.     On June 27, 2017, DPW fired Nelson Murray in a letter signed by defendant Gary COOPER, Director of Highway Construction and Maintenance.

### BALKIND AND DPW KNEW OF MURRAY'S PROTECTED ACTIVITY

73.     In sworn testimony on June 19, 2017, BALKIND acknowledged that he proposed Murray's termination because Murray's "correspondence with the department. . . [was] offensive." [Tr.p. 49:9] In said  correspondence Mr. Murray accused BALKIND, DUTCAVICH and DPW of discrimination, discriminatory harassment and retaliation.

74.     Upon information and belief, EEO Officer Jody Miller disclosed or caused to be disclosed to officials of DPW,  the nature and content of her April 3rd meeting with Mr. Murray, at which Mr. Murray accused BALKIND, DUTCAVICH and DPW of discrimination.

75.     In a phone conversation with Mr. Murray, EEO Officer Miller acknowledged that on or about April 28, 2017, several county officials contacted her about the EEO complaint Murray had filed.

76.     In a phone conversation with Mr. Murray, Union Shop Stewart James Dewitt acknowledged speaking with "the county" about Mr. Murray's EEO complaint on or about April 26,

2017.

77.   Mr. Murray mailed his EEO complaint to BALKIND by certified mail on or about April 23, 2017.  Upon information and belief, BALKIND received Mr. Murray's EEO complaint on or about April 26, 2017.  In his complaint, Mr. Murray accuses BALKIND, DUTCAVICH and DPW of race discrimination.

78.   Between April 27th and May 19th, BALKIND and DUTCAVICH received various voicemail, emails, grievances and other correspondence from Mr. Murray describing in detail the discrimination, discriminatory harassment and retaliation that Mr. Murray experienced and was experiencing at DPW.

79.   Finally, BALKIND acknowledges in his April 27th letter that he did receive Mr. Murray's "email, voice mail, written correspondence, etc." all of which accuse BALKIND, DUTCAVICH and DPW of discrimination, discriminatory harassment and retaliation against.

## DISPARATE TREATMENT AS
## FURTHER PROOF  OF RETALIATION

80.   BALKIND recommended Murray's   termination based exclusively upon charges of alleged insubordination related to his failure to accept two meeting notices and to attend two scheduled meetings with BALKIND.

81.   BALKIND testified that the department would "typically" negotiate the penalty of termination back to some lesser penalty. [Tr.p. 48:3-19]

82.   In Murray's case, BALKIND declined to negotiate a lesser penalty because he viewed Mr. Murray's correspondence with the department as "offensive."

83.   At all relevant times, as set forth in more detail above, individual defendants BALKIND,

DUTCAVICH, WHALEN AND COOPER participated directly in, aided and abetted, condoned, ratified and/or approved unlawful employment practices against Nelson Murray, with deliberate indifference to Mr. Murray's right to be free from unlawful discrimination and retaliation as set forth above.

## ALLEGATIONS FOR *MONELL* LIABILITY

84.    At all relevant times, for purposes of municipal liability under 42 USC sec. 1983 ("SEC. 1983"):

a.    The unlawful discriminatory and retaliatory acts, of the individual defendants amounted to a policy and/or custom of DPW:

      i.    to discriminate against employees of the Engineering Division of DPW based upon their race and color; and

      ii.    to retaliate against employees of the Engineering Division of DPW based upon their opposition to, reporting of, and/or complaining to the County EEO Officer and/or to supervisors at DPW, about having been subjected to unlawful race discrimination;

b.    Defendant DPW's failure to supervise and/or lack of training over management and/or supervisors of DPW (including the named individual defendants herein) was and continues to be so severe as to reach the level of 'gross negligence' or 'deliberate indifference' to the deprivation of Mr. Murray's right, as detailed above, to be free from:

      i.    discrimination in the workplace based upon his race or color;

      ii.    discriminatory harassment based upon his race or color; and

      iii.    retaliation against him based upon his opposition to, reporting of, and/or

complaining to EEO, DPW and/or supervisors at DPW about having been subjected to unlawful race discrimination; and/or

c.  Defendants BALKIND, WHALEN COOPER AND DUTCAVICH  served as final policymakers for the DPW and were personally responsible for:

i.  discriminating against Mr. Murray in his employment based upon his race and/or color; and

ii.  retaliating against Mr. Murray in his employment based upon his opposition to, reporting of, and/or complaining to the EEO, DPW and/or supervisors at the DPW that he had been subjected to unlawful discrimination based upon his race and color. See, McMilian v. Monroe County, 520 U.S. 781, 784-86, 117 S. Ct. 1734, 138 L. Ed. 2d 1 (1997).

85.  At all relevant times, as final policy makers of the DPW, defendants BALKIND, WHALEN COOPER AND DUTCAVICH were clothed with the authority of the laws, rules and or regulations of New York State, Dutchess County and the DPW.  Upon information and belief, BALKIND, WHALEN and COOPER are officials, agents and employees of the DPW and acted "under color of state and/or local law" with knowledge as to the facts alleged above, and are individually and severally liable for defendants' violation of plaintiff's rights under 42 USC sec. 1981, 42 USC sec. 1983, Title VII, the NYS Human Rights Law (the "NYSHRL") to be free from:

a.  discrimination in the terms and conditions of plaintiff's employment and a hostile work environment due to race and/or skin color; and

b.  retaliation against Mr. Murray in his employment based upon his opposition to, reporting of, and/or complaining to the County EEO, the CSEA Union,  and/or his supervisors at the

Engineering Division, DPW that he had been subjected to unlawful discrimination based upon race and/or skin color.

86.    Defendants' reasons for their adverse actions against plaintiff are mere pretext for:

a.    Unlawful discrimination against, harassment, and subjecting Mr. Murray to a hostile work environment based upon his race and/or skin color; and/or

b.    For Mr. Murray's opposition to, reporting of, and/or complaining to the EEO, DPW and/or supervisors at DPW that he had been subjected to unlawful discrimination based on race and/or skin color.

87.    As a result of defendants' unlawful discriminatory and retaliatory act against Mr. Murray, plaintiff has suffered and continues to suffer impairment and damage to plaintiff's good name and reputation.

88.    As a result of defendants' unlawful discriminatory and retaliatory acts against plaintiff, plaintiff has suffered and continues to suffer severe and lasting embarrassment, humiliation and anguish, and severe emotional and/or physical distress.

89.    Defendants' discriminatory and retaliatory acts were so outrageous and malicious and wanton, and as such, Defendants acted with such "deliberate indifference to plaintiff's known rights", and defendants committed these acts with reckless indifference to plaintiff's protected civil rights. As such, the individual defendants should be punished and deterred through an award of significant punitive damages.

90.    Defendants' discriminatory and retaliatory acts as set forth above in greater detail were intentional and in violation of SEC. 1981, SEC. 1983, Title VII, and the NYSHRL.

**AS AND FOR PLAINTIFF'S 1st CAUSE OF ACTION AGAINST DEFENDANTS BALKIND, WHALEN, COOPER AND DUTCAVICH FOR UNLAWFUL DISCRIMINATION AND HOSTILE WORK ENVIRONMENT BASED ON PLAINTIFF'S RACE UNDER §§1981 & 1983.**

91.    Plaintiff hereby repeats and re-alleges each factual allegation contained in the preceding paragraphs.

92.    As described in more detail above, defendants subjected plaintiff to discrimination, harassment and a hostile work environment based, in whole or in substantial part, on his race (African-American) in violation of SEC. 1981.

93.    Plaintiff's right to be free from unlawful race discrimination from the defendants herein under SEC. 1981 is secured under SEC. 1983, and defendants were acting "under color of state law" when they engaged in the unlawful race discrimination alleged herein.

**AS AND FOR PLAINTIFF'S 2nd CAUSE OF ACTION AGAINST DEFENDANTS BALKIND, WHALEN, COOPER AND DUTCAVICH FOR UNLAWFUL DISCRIMINATION AND HOSTILE WORK ENVIRONMENT BASED ON PLAINTIFF'S SKIN COLOR UNDER §§1981 & 1983.**

94.    Plaintiff hereby repeats and re-alleges each factual allegation contained in the preceding paragraphs.

95.    As described in more detail above, defendants subjected plaintiff to discrimination, harassment and a hostile work environment based, in whole or in substantial part, on his skin color (dark-skinned) in violation of SEC. 1981.

96.    Plaintiff's right to be free from unlawful discrimination based on his skin color from the defendants herein under SEC. 1981 is secured under SEC. 1983, and defendants were acting "under color of state law" when they engaged in the unlawful race discrimination alleged herein.

**AS AND FOR PLAINTIFF'S 3rd CAUSE OF ACTION AGAINST DEFENDANT DPW
FOR UNLAWFUL DISCRIMINATION AND HOSTILE WORK ENVIRONMENT
BASED ON
PLAINTIFF'S RACE UNDER TITLE VII.**

97.    Plaintiff hereby repeats and re-alleges each factual allegation contained in the preceding

paragraphs.

98.    As described in more detail above, defendant DPW subjected plaintiff to discrimination,

harassment, and a hostile work environment at the DPW based, in whole or in substantial part, on

plaintiff's race (African-American) in violation of TITLE VII, 42 U.S.C. §2000e et.seq.

**AS AND FOR PLAINTIFF'S 4th CAUSE OF ACTION AGAINST DEFENDANT DPW
FOR UNLAWFUL DISPARATE TREATMENT AND HOSTILE WORK
ENVIRONMENT BASED ON
PLAINTIFF'S SKIN COLOR UNDER TITLE VII.**

99.    Plaintiff hereby repeats and re-alleges each factual allegation contained in the preceding

paragraphs.

100.    As described in more detail above, defendant DPW subjected plaintiff to discrimination,

harassment and a hostile work environment at the DPW based, in whole or in substantial part, on his

skin color (dark-brown skinned) in violation of TITLE VII, 42 U.S.C. §2000e et. seq.

**AS AND FOR PLAINTIFF'S 5th CAUSE OF ACTION AGAINST ALL DEFENDANTS
FOR UNLAWFUL DISPARATE TREATMENT AND HOSTILE WORK
ENVIRONMENT BASED ON
PLAINTIFF'S RACE UNDER THE NYSHRL.**

101.    Plaintiff hereby repeats and re-alleges each factual allegation contained in the preceding

paragraphs.

102.    As described in more detail above, all defendants subjected plaintiff to discrimination,

harassment and a hostile work environment at the DPW based, in whole or in substantial part, upon his race (African-American) in violation of the New York State Executive Law §296 et. seq.

**AS AND FOR PLAINTIFF'S 6th CAUSE OF ACTION AGAINST ALL DEFENDANTS FOR UNLAWFUL DISPARATE TREATMENT AND HOSTILE WORK ENVIRONMENT BASED ON PLAINTIFF'S SKIN COLOR  UNDER THE NYSHRL.**

103.   Plaintiff hereby repeats and re-alleges each factual allegation contained in the preceding paragraphs.

104.   As described in more detail above, all defendants subjected plaintiff to discrimination, harassment and a hostile work environment at the DPW based, in whole or in substantial part, on his skin color (dark skinned) in violation the NYSHRL. The New York State Executive Law §296 et. seq.

**AS AND FOR PLAINTIFF'S 7th CAUSE OF ACTION AGAINST ALL DEFENDANTS FOR UNLAWFUL RETALIATION AGAINST PLAINTIFF FOR HIS OPPOSITION TO, REPORTING OF, AND COMPLAINING OF UNLAWFUL RACE AND COLOR DISCRIMINATION UNDER SEC. 1981 & 1983.**

105.   Plaintiff hereby repeats and re-alleges each factual allegation contained in the preceding paragraphs.

106.   As described in more detail above, defendants subjected plaintiff to unlawful retaliation for his opposition to, his reporting of, and complaints about race and color discrimination in violation of SEC. 1981.  Plaintiff's right to be free from unlawful retaliation from the defendants herein under SEC. 1981 is secured under SEC. 1983, and defendants were acting "under color of state law" when they engaged in the unlawful retaliation alleged herein.

**AS AND FOR PLAINTIFF'S 8th CAUSE OF ACTION AGAINST DEFENDANT DPW**

**FOR UNLAWFUL RETALIATION AGAINST PLAINTIFF FOR HIS OPPOSITION TO, REPORTING OF, AND COMPLAINING OF UNLAWFUL RACE, & COLOR DISCRIMINATION UNDER TITLE VII.**

107.   Plaintiff hereby repeats and re-alleges each factual allegation contained in the preceding paragraphs.

108.   As described in more detail above, defendants subjected plaintiff to unlawful retaliation for his opposition to, his reporting of, and complaints about race, color, and national origin discrimination in violation of Title VII.

**AS AND FOR PLAINTIFF'S 9th CAUSE OF ACTION AGAINST ALL DEFENDANTS FOR UNLAWFUL RETALIATION AGAINST PLAINTIFF FOR HIS OPPOSITION TO, REPORTING OF, AND COMPLAINING OF UNLAWFUL RACE AND COLOR DISCRIMINATION UNDER THE NYSHRL.**

109.   Plaintiff hereby repeats and re-alleges each factual allegation contained in the preceding paragraphs.

110.   As described in more detail above, defendants subjected plaintiff to unlawful retaliation for his opposition to, his reporting of, and complaints about race, color, national origin and disability discrimination in violation of the NYSHRL.

**PRAYER FOR RELIEF**

WHEREFORE, plaintiff prays that this Court empanel a jury of plaintiff's peers, and enter judgment against defendants as follows, in an amount to be determined at trial inclusive but not limited to payment of his back and front pay, compensatory damages, and punitive damages, and:

(a)     an award of full compensatory damages as against all defendants for their unlawful discriminatory and retaliatory acts against Mr. Murray for an amount not less than $500,000.00, the full amount to be determined at trial, including payment for any income and/or benefits lost, his

suffering severe physical and mental distress and injury, mental anguish, humiliation, and embarrassment from defendants' unlawful discriminatory and retaliatory acts under SEC. 1981, SEC. 1983, TITLE VII, the NYSHRL;

(b)    an award of punitive damages and/or liquidated damages against all defendants to the extent permitted by statue, for their unlawful discriminatory and retaliatory acts against plaintiff for an amount not less than $1,000,000.00, the full amount to be determined at trial under SEC. 1981, SEC. 1983, TITLE VII, and 42 USC sec. 1988;

(c)    an award of front pay and back pay against all defendants for defendants unlawful discriminatory and retaliatory acts against plaintiff for an amount not less than $150,000.00, the full amount to be determined at trial under Title VII, 42 U.S.C. §2000e-5(g)(1).

(d)    an award of plaintiff's reasonable attorney's fees and the costs of prosecuting this action under SEC. 1981, SEC. 1983, TITLE VII and the NYSHRL; and

(e)    any such other and further relief as to this Court may seem just and proper.

Dated:    November 20, 2017
          Poughkeepsie, New York

THE LAW OFFICE OF D. JEN BROWN, P.L.L.C.

*D. Jen Brown*
Deirdra Jeneva Brown
272 Mill Street
Poughkeepsie, New York 12601
JenBrown@DJenBrownESQ.com
(845) 454-0835, Fax (845) 454-0836

USDC SDNY BAR# DB0307
ATTY REG# 2378404