UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

NELSON A. MURRAY,

                                    Plaintiff,

         v.

DUTCHESS COUNTY EXECUTIVE
BRANCH, *et al.*,

                                    Defendants.

No. 17-CV-9121 (KMK)

OPINION & ORDER

Appearances:

Deirdra J. Brown, Esq.
The Law Office of D. Jen Brown, Esq.
Poughkeepsie, NY
*Counsel for Plaintiff*

Peter Van Schaick, Esq.
Peter Van Schaick, PC
Poughkeepsie, NY
*Counsel for Plaintiff*

David L. Posner, Esq.
McCabe & Mack LLP
Poughkeepsie, NY
*Counsel for Defendants*

KENNETH M. KARAS, United States District Judge:

Nelson A. Murray ("Plaintiff"), a former employee Dutchess County's Department of

Public Works (the "Department"), brings the instant Action against the Dutchess County

Executive Branch ("Dutchess County"); Robert Balkind ("Balkind"), the Department

Commissioner; and Matthew Dutcavich ("Dutcavich"), Plaintiff's supervisor (collectively,

"Defendants").[1]  Plaintiff alleges that Defendants discriminated and retaliated against him on the basis of race, maintained a racially hostile work environment, and conspired to terminate him, in violation of 42 U.S.C. §§ 1981, 1983, and 1985; Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e-5 *et seq.*; and the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 296 *et seq.*  (*See* Am. Compl. (Dkt. No. 18).)[2]  Before the Court is Defendants' partial Motion To Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) (the "Motion").  (Not. of Mot. (Dkt. No. 29).)  For the reasons that follow, the Motion is granted in part and denied in part.

---

[1] The Dutchess County Executive Branch is a component of Dutchess County itself. Accordingly, the Clerk of Court is directed to amend the caption to substitute Dutchess County for "Dutchess County Executive Branch."  *See* Fed. R. Civ. P. 21.

Separately, Plaintiff seeks to name as defendants (1) Marcus J. Molinaro ("Molinaro"), the Dutchess County Executive; and (2) James Dewitt ("Dewitt"), the County's Union Shop Steward.  (*See* Am. Compl. 1 (Dkt. No. 18).)

As to Molinaro, who is sued in his official capacity, an "official-capacity suit[] generally represent[s] only another way of pleading an action against an entity of which an officer is an agent."  *Tanvir v. Tanzin*, 894 F.3d 449, 458 (2d Cir. 2018) (citation and quotation marks omitted).  That is because "the real party in interest is the governmental entity and not the named official."  *Id.* (citation, quotation marks, and alteration omitted).  Here, as Defendants argue and Plaintiff acknowledges, Dutchess County, the real party in interest, has already been named as a Defendant.  (*See* Mem. of Law in Supp. of Mot. ("Defs.' Mem.") 1 (Dkt. No. 31); Resp. in Opp'n to Mot. ("Pl.'s Mem.") 2 (Dkt. No. 43).)  The Court thus construes Plaintiff's claims against Molinaro as against the County.  Should Plaintiff wish to proceed against Molinaro in his individual capacity, the Court directs Plaintiff to complete service on Molinaro within 30 days of the date of this Opinion, or he will be dismissed.

As to Dewitt, a district court lacks personal jurisdiction over those defendants not properly served.  *See Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50, 59 (2d Cir. 2012).  Plaintiff has not indicated that a summons has been issued or service effected on Dewitt.  Defendants argue that "[b]ecause of the specific nature of the allegations" against Dewitt, which relate to Dewitt's union activities, "Dutchess County cannot assume responsibility for his union related conduct nor represent him in this litigation."  (Defs.' Mem. 1–2.)  Plaintiff fails to respond to this argument.  (*See* Pl.'s Mem. 2–3.)  The Court directs Plaintiff to complete service on Dewitt within 30 days of the date of this Opinion, or he will be dismissed.

[2] Plaintiff also seeks to bring this Action on behalf of a class of similarly situated County employees.  (Am. Compl. ¶¶ 2, 15–23.)

## I.  Background

### A.  Factual History

#### 1.  Documents Considered by the Court

The following facts are drawn principally from the Amended Complaint and are taken as true for purposes of resolving the instant Motion.

A court addressing a Rule 12(b)(6) motion may consider, in addition to the operative pleading, "any statements or documents incorporated in [the operative pleading] by reference," as well as "matters of which judicial notice may be taken, and documents either in [the] plaintiff['s] possession or of which [he] had knowledge and relied on in bringing suit." *Kalyanaram v. Am. Ass'n of Univ. Profs. at N.Y. Inst. of Tech., Inc.*, 742 F.3d 42, 44 n.1 (2d Cir. 2014) (citations, alterations, and quotation marks omitted).  "To be incorporated by reference, the [pleading] must make a clear, definite[,] and substantial reference to the documents." *Thomas v. Westchester County Health Care Corp.*, 232 F. Supp. 2d 273, 275 (S.D.N.Y. 2002) (citation omitted).  Here, the Court relies upon documents that have been submitted by both Parties and that are integral to and explicitly referenced by the Amended Complaint.  *See Laface v. E. Suffolk Boces*, 349 F. Supp. 3d 126, 143 (E.D.N.Y. 2018) (holding, on motion to dismiss, that the court will consider documents where "[t]he [p]laintiff specifically mention[ed] the[] documents throughout the complaint and relied on their terms or contents while drafting the complaint"); *Falcon v. City Univ. of New York*, 263 F. Supp. 3d 416, 424 (E.D.N.Y. 2017) (holding, on motion for judgment on the pleadings, that the court will consider EEOC documents submitted by the defendant where "the complaint references the [p]laintiff's EEOC filings, and she even included the EEOC's findings, and her right to sue letters," and "[a]lthough [the plaintiff] did not include all of the EEOC paperwork . . . , she ha[d] notice of those documents

because she submitted them and received them, and she based the instant action on those proceedings").

The Court recounts only those facts necessary for consideration of the instant Motion.

### 2. Statistical Background

Plaintiff broadly alleges that Dutchess County's 2013 Affirmative Action Plan and Workforce Analysis (the "2013 Analysis") demonstrates that the County maintains "gross disparities of statistical significance between the number of minorities employed . . . and the number expected to be employed under fair, non-discriminatory practices." (Am. Compl. ¶ 24.)[3] In particular, Plaintiff alleges that, according to the 2013 Analysis, there were 1,966 County employees in 2013, of which 284 were minorities; yet, if the County workforce reflected the local labor market, the County should have expected to have 411 minority employees. (*Id.* ¶ 25.) That disparity of 127 minority employees is "7.04 standard deviations" from the predicted outcome, which "creates a strong presumption of discrimination." (*Id.*)[4] In the County's Department of Public Works — the Department in which Plaintiff was employed — there were 259 employees in 2013, of which 22 were minorities where 54 would be predicted; that disparity

---

[3] No Party has submitted the 2013 Analysis to the Court.

[4] "A standard deviation analysis measures the probability that a result occurred randomly — the more standard deviations, the lower the probability that the result is random." *E.E.O.C. v. Joint Apprenticeship Comm. of Joint Indus. Bd. of Elec. Indus.*, 186 F.3d 110, 117 n.2 (2d Cir. 1999) (citation omitted). As Plaintiff suggests, (*see* Am. Compl. ¶ 24 n.6), "a finding of two to three standard deviations can be highly probative of discriminatory treatment," *E.E.O.C. v. Mavis Disc. Tire, Inc.*, 129 F. Supp. 3d 90, 110 (S.D.N.Y. 2015) (quoting *Ottaviani v. State Univ. of N.Y. at New Paltz*, 875 F.2d 365, 372 (2d Cir. 1989)); *see also Adams v. Ameritech Servs., Inc.*, 231 F.3d 414, 424 (7th Cir. 2000) ("Two standard deviations is normally enough to show that it is extremely unlikely (that is, there is less than a 5% probability) that the disparity is due to chance, giving rise to a reasonable inference that the hiring was not race-neutral; the more standard deviations away [from zero], the less likely the factor in question played no role in the decision making process." (citations omitted)).

is 4.9 standard deviations from the predicted outcome, which again "creates a strong presumption of discrimination." (*Id.* ¶ 27(c).)[5]

Plaintiff alleges that, notwithstanding these stark statistical disparities, the County "has failed to effectively implement an equal opportunity compliance program" and thus has "developed a culture that actively practices or passively tolerates workplace discrimination." (*Id.* ¶ 31.) In addition, Plaintiff alleges that the County has failed to publish a more recent statistical analysis; to "train its managers in skills that reduce implicit bias"; to "monitor employment decisions at the level necessary to discover systemic differences in treatment"; to "hold its managers . . . accountable for the quality of their [employment] decisions"; to "systematically recruit minorities"; to "investigate claims of . . . discrimination"; and to "institute[] procedures for protecting employees who complain" of discrimination. (*Id.* ¶ 32.)[6]

### 3. Plaintiff's Hiring

Plaintiff is an African-American man. (*Id.* ¶ 9.) In 2004, Plaintiff applied for a position with Dutchess County's Department of Public Works (the "Department") as a Junior Civil Engineer. (*Id.* ¶ 39.) The County maintains five relevant engineering positions. (*Id.* ¶ 48.) In order of ascending hierarchy, those positions are: Engineering Aide ("EA"), Senior Engineering Aide ("SEA"), Junior Civil Engineer ("JCE"), Assistant Civil Engineer I ("ACE I"), and Assistant Civil Engineer II ("ACE II"). (*Id.*) As of 2004, Plaintiff had seven years of field experience, as well as a relevant certification and "several college credits toward a degree in civil engineering"; those qualifications met the criteria required for the JCE position. (*Id.* ¶¶ 39–40.)

---

[5] Further related statistical allegations may be found at Am. Compl. ¶¶ 27–30.

[6] Plaintiff makes further related allegations as to the County's toleration of racially discriminatory practices at Am. Compl. ¶¶ 36–38.

However, the County "rejected [Plaintiff's] application" and "selected another candidate." (*Id.* ¶ 41.) Plaintiff "remained in continuous contact" with the County for two years to obtain a position, during which time the Department allegedly hired "seven new employees (all White)." (*Id.* ¶¶ 41–42.) However, Plaintiff only lists six such employees — Vasily Shatalov ("Shatalov") and Darren Hawkins ("Hawkins"), hired as EAs; William Trifilo ("Trifilo") and Larry Donnelly ("Donnelly"), hired as SEAs; and Soma Mathews ("Mathews") and Ashur Udin ("Udin"), hired as JCEs. (*Id.* ¶ 42.) Further, Plaintiff indicates that two of those employees, Udin and Mathews, are "East Indian." (*Id.* ¶¶ 42, 49.) Plaintiff alleges that each of the hired employees except Trifilo had less field experience than he had. (*Id.* ¶ 42.)

In 2007, Plaintiff obtained a position with the County as an SEA, by which time he had ten years of field experience. (*Id.* ¶ 43.) Since Plaintiff's hiring, the Department "has employed two minority SEAs." (*Id.* ¶ 50.) Plaintiff does not identify the other minority SEA employee.

### 4.  Overtime

County employees must receive authorization from a Department head before working overtime. (*Id.* ¶ 44.) The collective bargaining agreement between the County and Civil Service Employees Union (the "Union") requires that overtime and premium pay opportunities be rotated on an "equitable basis . . . consistent with the most effective operation of the Unit." (*Id.* ¶ 45.)

Plaintiff broadly alleges that white employees in the Department were favored over minority employees in awarding overtime opportunities. (*Id.* ¶ 46.) In support, Plaintiff cites two examples. First, in 2014, Plaintiff's Department supervisor (who is unnamed) "told him that there were on overtime hours available due to cutbacks," when Plaintiff knew that a white coworker (who is unnamed and whose position is not specified) had received substantial overtime "during the height of the construction busy season." (*Id.* ¶ 46(a).) Second, in

November 2016, Defendant Dutcavich, Plaintiff's direct supervisor, assigned Shatalov, a white employee and by then a JCE, to work overtime on Election Day, after which Plaintiff requested to work overtime on Veteran's Day.  (*Id.* ¶¶ 13, 47(a), 49(f).)  However, Dutcavich denied Plaintiff's request and instead assigned Shatalov to work Veteran's Day.  (*Id.*)  When Plaintiff pressed for an explanation, Dutcavich did not respond.  (*Id.* ¶ 47(b).)

Separately, Plaintiff alleges that the Department lacked "procedures" and "records" for "deciding who would receive overtime hours," and permitted "subjective decision-making" in the assignment of overtime, thus "creat[ing] disparities between white and minority employees." (*Id.* ¶¶ 47(c)–(d).)

### 5. Promotions

The County maintains a practice of promoting engineers "through the ranks."  (*Id.* ¶ 48.) Plaintiff alleges that, between 2009 and 2014, the County promoted "approximately twelve" employees in the Department, all of them allegedly white.  (*Id.* ¶¶ 49–50.)  Those promotions were: Trifilo, from SEA to JCE in 2009; Donnelly, from SEA to JCE in 2009; Hawkins, from EA to SEA in 2009; Dutcavich, from JCE to ACE I in 2009 and then to ACE II in 2010; Shatalov, from EA to SEA in 2009, and then to JCE later the same year (thus "leap-frogg[ing]" Plaintiff); Udin (who, as noted, is described as "East Indian"), from JCE to ACE I in 2009; and Defendant Balkind, from ACE II to Director of Highway, in 2009, to Deputy Commissioner in 2012, and to Commissioner in 2014.  (*Id.* ¶¶ 49, 57(b).)

Plaintiff was not promoted out of his SEA position, nor did the Department's two other minority employees (who are unnamed) receive promotions.  (*Id.* ¶ 50.)  That was so despite Plaintiff's extensive field experience and skill set, which was widely recognized throughout the Department.  (*Id.* ¶ 55 (describing specific instances in which members of the Department,

including Balkind, spoke positively about Plaintiff's experience and knowledge); *see also id.*
¶ 57(b) (alleging that Plaintiff had previously "passed the EA and SEA Civil Service Exams with
scores of 90 Rank 2 and 95 Rank 1 respectively").)

Plaintiff further alleges that the collective bargaining agreement with the Union requires
the County to conduct regular "employee performance appraisals," which are to be assigned
"primary significance" in consideration for promotion. (*Id.* ¶ 52.) Yet, the Department failed to
conduct such appraisals; rather, Department supervisors "provided irregular and inconsistent
performance feedback or guidance marking a clear path to advancement." (*Id.* ¶ 53.) Indeed,
such feedback was often "misleading" and "incomplete." (*Id.* ¶¶ 54, 56.) For example, in May
2008, Plaintiff's then-supervisor (who is unnamed) told him that "'[i]nspection is an opportunity
to impress your bosses so you earn good professional achievement marks for consideration in
future promotions,'" yet, notwithstanding Plaintiff's "superior" skills, Plaintiff "was not
considered or provided with a pathway to advancement." (*Id.* ¶ 56(a).)

Separately, Plaintiff alleges that he was "actively dissuaded . . . from taking the civil
service exam needed to qualify for promotion." (*Id.* ¶¶ 54, 57(c).) In particular, Plaintiff alleges
that, in 2012, he "passed the promotional exam for JCE," thus making him eligible for promotion
from SEA into that position. (*Id.*) Then, in 2014, Plaintiff "resumed taking [relevant] courses
toward an associate's degree," told Department head Balkind as much, and requested
consideration for promotion to JCE. (*Id.* ¶¶ 57(d)–(e).) Balkind told Plaintiff "that if he wished
to become a JCE, he should submit a request to have his position evaluated for reclassification."
(*Id.* ¶¶ 56(b), 57(f).) Yet, when Plaintiff did so, the County "did not investigate or adjudicate his
request" and later told him that the request had "fallen through the cracks." (*Id.* ¶¶ 56(b), 57(g).)

### 6.  Allegations of Discrimination

#### a.  Allegations of Discrimination Upon Being Hired

Plaintiff alleges that, in 2007, during his "first days on the job," he was told by the Director of Engineering — who is unnamed and with whom Plaintiff had a "frank" relationship — "to expect 'resistance' from his coworkers because of his color."  (*Id.* ¶ 58.)  Soon thereafter, the Director of Engineering asked Plaintiff to conduct a particular "training session" for the Department employees "because of [Plaintiff's] ten years of field experience," yet, "plans fell through when [Plaintiff's] co-workers declined to attend."  (*Id.* ¶ 59(a).)  Around the same time, Plaintiff's then-supervisor, who is unnamed, "isolated" Plaintiff by not placing him in a small assignment group when other employees were placed in such groups (e.g., the "survey group," the "design group," and the "inspection group").  (*Id.* ¶ 59(b).)  This left Plaintiff to complete certain tasks "on his own, thus denying him the opportunity to benefit from social networking, intra-group training[,] and professional bonding."  (*Id.*)  Finally, "[o]n one occasion" early in Plaintiff's employment, "after working late, [Plaintiff] left the office and was walking through the facility garage" when another Department employee (who is unnamed) "yelled rudely at [him], demanding to know who he was and why he was there" and "demanding to see [his] identification."  (*Id.* ¶ 59(c).)  Plaintiff reported the incident, which "rattled" him, but the County failed to investigate it or to "correct for micro-aggressions in the workplace."  (*Id.*)

#### b.  Central Allegation of Discrimination

In February 2017, Plaintiff was assigned to be an on-site field inspector for a "major bridge rehabilitation project" (the "Project"), which was then the Department's "largest project." (*Id.* ¶ 60(a).)  Defendant Dutcavich, who is white, was the supervisor on the Project.  (*Id.* ¶ 60(b).)  The outside contractor with whom the County was working on the Project "did not

meet its obligation to provide and maintain a work-site trailer or a dedicated bathroom facility for [Plaintiff] to use," thus "making it difficult for [Plaintiff] to prepare and file reports and to even use the restroom." (*Id.* ¶ 60(c).) The trailer also lacked "a continual source of power, lights, heat/air, . . . internet signal[,] and office supplies." (*Id.*) As a result, Plaintiff suffered multiple "micro-inequities"; for example, he would sometimes have to "work from his car," to "drive . . . home . . . to use the bathroom and to heat his lunch," to drive to the central office "after his regular work hours to use the . . . computers to upload daily reports and other data," and to "work with the field trailer door propped open in order to provide light while meeting with others." (*Id.*) Plaintiff "repeatedly complained" about these issues to Dutcavich and "emphasiz[ed] that his [w]hite colleagues would not be ignored if they complained of such deficiencies," yet, apparently, Dutcavich did nothing. (*Id.* ¶ 60(d).) In late March or early April 2017, Plaintiff complained again to Dutcavich, stating that his "failure [to] . . . address the worksite deficiencies [at the Project] . . . was discriminatory." (*Id.* ¶ 60(e).)

On April 3, 2017, Plaintiff visited Jody Miller, the County's EEO Counselor, seeking to lodge a formal complaint of racial discrimination against Dutcavich. (*Id.* ¶ 61.)

On April 14, 2017, Dutcavich wrote a memorandum to Plaintiff, stating:

On the morning of April 12, we [i.e., Plaintiff and Dutcavich] discussed the need to work additional hours on the . . . [P]roject to keep up with report writing. During this discussion, you stated that working additional hours beyond your base hours might be problematic at times for several reasons, including levels of job stress, conflicts with your personal schedule outside of work, age, and lack of a set schedule to plan around.

In an effort to normalize the schedule . . . and aid[] in the writing of daily reports when time does not allow during the course of normal hours, I propose that you may work a schedule . . . [that will] provide[] for additional time to write daily reports. The additional 5 hours would be overtime . . . .

> If you find this schedule is insufficient . . . , please inform Robert Balkind and myself, so that we can further discuss what may be necessary to meet the [P]roject demands.

(*Id.* ¶ 63; Affid. of David L. Posner, Esq. ("Defs.' Decl.") Ex. F ("April 14 Memorandum") (Dkt. No. 30).) Dutcavich "inexplicably" sent a copy of the April 14 Memorandum to Balkind, the Department head. (Am. Compl. ¶ 65.) Plaintiff alleges that the content of the April 14 Memorandum was "patently false" and in fact a "set-up for retaliation." (*Id.* ¶ 64.) Indeed, Plaintiff emailed a friend and stated, "[T]hey must know I had a sit down with" the EEO Counselor. (*Id.*)

On April 23, 2017, Plaintiff filed a formal EEOC Complaint of discrimination and sent copies to Dutcavich and Balkind. (*Id.* ¶ 70(c); *see also id.* Defs.' Decl. Ex. C ("EEOC Complaint").) According to a stamp on the first page of the EEOC Complaint, it was received by the Department on April 26, 2017. (EEOC Complaint 1.) Plaintiff also sent a copy of the EEOC Complaint to James Dewitt, the County's Union Shop Steward, requesting the Union's representation. (Am. Compl. ¶ 74.)

On April 24, 2017, Plaintiff received a letter from Balkind "summoning [him] to a meeting in his office." (*Id.* ¶ 66.) The letter, which is dated April 20, 2017, states:

> On Wednesday, April 19, 2017 I received a report and photographs that on various occasions, from April 4, 2017 through April 18, 2017, your County assigned vehicle . . . was seen at your home address during times that you were expected to be on the job at the [Project] . . . .
>
> You are hereby directed to participate in a meeting to discuss these allegations. As this discussion may lead to disciplinary actions against you, pursuant to Subdivision 2 of Section 75 of the Civil Service Law, you are hereby notified that you have the right to representation by your union representative during the meeting. If representation is requested, you shall have a reasonable period of time to obtain such representation. If you are unable to obtain such representation within a reasonable period of time, the meeting shall continue without representation.

The meeting is scheduled for Thursday, April 27, 2017 at 3:00 pm in the office of the Commissioner. You must complete and sign the attached form to confirm that you are aware of your right to union representation.

(Defs.' Decl. Ex. G ("Balkind Letter").) Plaintiff emphasizes that, according to the Balkind Letter, the photographs were taken beginning "the day after [Plaintiff] met with" the EEO Counselor. (Am. Compl. ¶ 67.) Plaintiff alleges that he had never before "been summoned to a meeting in the Commissioner's office," and indeed "had never been counseled, warned[,] or . . . reprimand[ed] for misconduct of any kind." (*Id.* ¶ 68.) Plaintiff further alleges that the alleged County car issue was "pretext" and in fact Balkind "knew of [Plaintiff's] . . . complaints of discrimination." (*Id.* ¶¶ 69–70.)

On April 26, 2017, Plaintiff emailed Dutcavich and Balkind "detailing acts of discrimination and reprisals" and "questioning why the alleged 'surveillance'" of Plaintiff "began on April 4, the day after his meeting with the County EEO officer." (*Id.* ¶ 70(d).)[7]

Plaintiff does not seem to have appeared for the April 27, 2017 meeting requested by Balkind. (*See id.* ¶ 72 (noting without contradiction that Balkind accused Plaintiff of "refusing to attend a meeting"); Defs.' Decl. Ex. D, at 11 (April 27, 2017 letter from Balkind to Plaintiff stating that they "had a meeting scheduled on Thursday April 27, 2017 at 3:00pm to discuss why the County vehicle [Plaintiff] was assigned . . . was seen at [Plaintiff's] home . . . and to inform [Plaintiff] of the Department's expectations when using a County vehicle").)

---

[7] Also on or about April 26, 2017 — the date is unclear — Balkind allegedly "confronted" Plaintiff "in the parking lot" while "accompanied by two armed County sheriff's deputies," "relieved him of his credentials," and "ordered him off of County property." (*Id.* ¶ 72.) According to an April 27, 2017 letter sent by Balkind to Plaintiff, this was because "there was an active shooter situation." (Defs.' Decl. Ex. D, at 11 (April 27, 2017 letter from Balkind to Plaintiff).) Plaintiff does not further describe this alleged incident in the Amended Complaint. Nor does Plaintiff argue in his other submissions that this incident was an instance of discrimination or retaliation.

On about April 28, 2017, Dewitt responded to Plaintiff stating that "he could not represent [Plaintiff] . . . because [Plaintiff] had filed EEO charges against [Dutcavich], and the Union would have to represent [Dutcavich] against those charges." (*Id.* ¶ 76.)

On May 14, 2017, Plaintiff sent a letter to Balkind "pointing out that he had been passed over for promotions, among other things, that were given to his less qualified 'Caucasian' colleagues, and that he felt undervalued and persecuted." (*Id.* ¶ 70(e).)

On May 15, 2017, Plaintiff filed a supplement to his EEOC Complaint and sent a copy to Balkind. (*Id.* ¶ 70(f).)

On May 19, 2017, Balkind charged Plaintiff with "insubordination" on the ground that Plaintiff "refus[ed] to attend" the April 27, 2017 meeting. (*Id.* ¶ 72; Defs.' Decl. Ex. Q (charge of insubordination dated May 19, 2017).) Balkind allegedly recommended that Plaintiff be terminated. (Am. Compl. ¶ 71.) Plaintiff alleges that Balkind's charge and recommendation demonstrated his "subjective-decision making with regard to the level of discipline imposed" and his failure to "follow . . . the County's policies favoring progressive discipline," particularly given that this was Plaintiff's first offense. (*Id.* ¶ 73.)

Plaintiff was thereafter found guilty of the insubordination charge and, on June 27, 2017, was terminated. (Defs.' Decl. Ex. S (letter of termination dated June 27, 2017).)

B. Procedural History

Plaintiff filed the initial Complaint on November 21, 2017. (Dkt. No. 1.) Plaintiff filed the instant Amended Complaint on October 26, 2018. (Am. Compl. (Dkt. No. 18).)[8] Defendants filed the instant Motion to dismiss and accompanying papers on January 30, 2019. (Not. of Mot. (Dkt. No. 29); Defs.' Decl.; Defs.' Mem.) Plaintiff filed a response in opposition on April 24,

---

[8] The Amended Complaint had previously been incorrectly filed. (Dkt. Nos. 11, 12.)

2019.  (Pl.'s Mem.)  Defendants filed a reply on May 3, 2019.  (Affid. of David L. Posner, Esq. in Supp. of Mot. (Dkt. No. 45); Reply Mem. of Law in Supp. of Mot. ("Defs.' Reply") (Dkt. No. 46).)

## II.  Discussion

### A.  Standard of Review

The Supreme Court has held that, while a complaint "does not need detailed factual allegations" to survive a motion to dismiss, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations, quotation marks, and alterations omitted).  Indeed, Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement."  *Id.* (quotation marks and alteration omitted). Rather, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level."  *Twombly*, 550 U.S. at 555.  Although "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563, and a plaintiff need allege "only enough facts to state a claim to relief that is plausible on its face," *id.* at 570, if a plaintiff has not "nudged [his or her] claim[] across the line from conceivable to plausible, the[] complaint must be dismissed," *id.*; *see also Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.  But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged — but it has not 'show[n]' — 'that the

pleader is entitled to relief.'" (citation omitted) (second alteration in original) (quoting Fed. R. Civ. P. 8(a)(2))); *id.* at 678–79 ("Rule 8 marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

In considering a motion to dismiss, the Court "must accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam); *see also Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014) (same). Further, "[f]or the purpose of resolving [a] motion to dismiss, the Court . . . draw[s] all reasonable inferences in favor of the plaintiff." *Daniel v. T & M Prot. Res., Inc.*, 992 F. Supp. 2d 302, 304 n.1 (S.D.N.Y. 2014) (citing *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012)). Finally, the Court "must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) (citation and quotation marks omitted).

B. Analysis

Plaintiff brings claims of disparate treatment, disparate impact, hostile work environment, retaliation, and conspiracy. (Am. Compl. ¶¶ 77–117.)[9] Defendants seek dismissal of all claims

---

[9] Plaintiff's claims are brought pursuant to 42 U.S.C. §§ 1981, 1983, 1985, Title VII, and the NYSHRL. As to the § 1981 claims, the Second Circuit has recently held that "§ 1981 does not provide a separate private right of action against state actors." *Duplan v. City of New York*, 888 F.3d 612, 621 (2d Cir. 2018). Because § 1983 provides the "exclusive federal remedy" against state actors, *id.* at 619 (italics omitted), the Court construes Plaintiff's § 1981 claims as brought under § 1983, *see Gonzalez v. City of New York*, 377 F. Supp. 3d 273, 285 (S.D.N.Y. 2019) (stating that *Duplan* applies not just to claims against the municipality itself but against individual municipal defendants); *see also Collymore v. City of New York*, 767 F. App'x 42, 45 n.2 (2d Cir. 2019) ("[T]he district court properly construed [the plaintiff's] [§] 1981 claims as [§] 1983 claims [pursuant to *Duplan*].").

— except the disparate impact claim — principally on the ground that Plaintiff fails on the merits to state any claim.  (*See generally* Defs.' Mem.; Defs.' Reply.)[10]

The Court addresses each argument separately to the extent necessary.

### 1.  Disparate Treatment

Title VII makes it unlawful for an employer to "discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race [or] color."  42 U.S.C. § 2000e-2(a)(1).  Courts analyzing claims under Title VII follow the familiar *McDonnell Douglas* three-part burden-shifting test.  *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973).  Under that framework, the plaintiff carries the initial burden of making out a prima facie case of discrimination.  *See Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001).  To do so, a plaintiff "must show: (1) that he belonged to a protected class; (2) that he was qualified for the position he held; (3) that he suffered an adverse employment action; and (4) that the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent."  *Holcomb v. Iona Coll.*, 521 F.3d 130, 138 (2d Cir. 2008) (citation omitted); *see also Dickens v. Hudson Sheraton Corp., LLC*, 167 F. Supp. 3d 499, 518 (S.D.N.Y. 2016) (same), *aff'd*, 689 F. App'x 670 (2d Cir. 2017).  If the plaintiff states a prima facie case,

---

[10] Defendants also argue that Plaintiff's claims prior to June 2016 are time-barred, and that Plaintiff's EEOC Complaint raises only claims relating to the events of early 2017 culminating in his termination, and does not allege discrimination in hiring, promotion, or overtime.  (Defs.' Mem. 16–17.)  Plaintiff has clarified, however, that he "included these [older] allegations to illustrate the pattern and practice of discrimination that is statistically documented in the [2013 Analysis]" and to "provide context for [Plaintiff's] hostile work environment claim."  (Pl.'s Mem. 15.)

Finally, Defendants argue that Dutcavich and Balkind are entitled to qualified immunity on Plaintiff's § 1983 claims.  (Defs.' Mem. 28.)  Yet, Defendants merely restate the qualified immunity caselaw without meaningfully applying it to the facts of the case.  The Court therefore declines to consider at this time whether any Defendant is protected by qualified immunity.

"the burden shifts to the defendant to articulate 'some legitimate, non-discriminatory reason' for its action." *Holcomb*, 521 F.3d at 138 (quoting *McDonnell Douglas*, 411 U.S. at 802). "If such a reason is provided, [the] plaintiff may no longer rely on the presumption raised by the prima facie case, but may still prevail by showing, without the benefit of the presumption, that the employer's determination was in fact the result of racial discrimination." *Id.*; *see also Abdu-Brisson*, 239 F.3d at 469 ("Once the employer has articulated non-discriminatory reasons for the challenged employment actions, the presumption of discrimination vanishes and the burden shifts back to the plaintiff to come forward with evidence that the employer's proffered explanations were merely pretextual and that the actual motivations more likely than not were discriminatory." (citations omitted)).

The prima facie case requirement does not require that the plaintiff provide "evidence sufficient to show discriminatory motivation," but rather creates "a temporary presumption of discriminatory motivation, shifting the burden of production to the employer and requiring the employer to come forward with its justification for the adverse employment action against the plaintiff." *Littlejohn v. City of New York*, 795 F.3d 297, 307 (2d Cir. 2015) (citations and quotation marks omitted). The prima facie case is an evidentiary standard, and not a pleading requirement; therefore, a plaintiff need not *allege* a prima facie case to survive a motion to dismiss his discrimination claim. *See Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 508 (2002) ("[A] complaint in an employment discrimination lawsuit [need not] contain specific facts establishing a prima facie case of discrimination . . . ."); *see also Ingrassia v. Health & Hosp. Corp.*, 130 F. Supp. 3d 709, 719 (E.D.N.Y. 2015) ("A plaintiff alleging employment discrimination thus may withstand a motion to dismiss without pleading each element of a prima facie case." (citation and italics omitted)).

The Second Circuit has explained that "what must be plausibly supported by facts alleged in the complaint is that the plaintiff is a member of a protected class, was qualified, suffered an adverse employment action, and has at least minimal support for the proposition that the employer was motivated by discriminatory intent." *Littlejohn*, 795 F.3d at 311. "The facts required . . . to be alleged in the complaint need not give plausible support to the ultimate question of whether the adverse employment action was attributable to discrimination," but rather the facts "need only give plausible support to a minimal inference of discriminatory motive." *Id.*; *see also Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 87 (2d Cir. 2015) ("[A] plaintiff must allege that the employer took adverse action against [him] at least in part for a discriminatory reason, and [he] may do so by alleging facts that directly show discrimination or facts that indirectly show discrimination by giving rise to a plausible inference of discrimination." (citation omitted)). Courts making the plausibility determination should do so "mindful of the elusive nature of intentional discrimination" and the concomitant frequency by which plaintiffs must "rely on bits and pieces of information to support an inference of discrimination, i.e., a mosaic of intentional discrimination." *Vega*, 801 F.3d at 86 (citation, italics, and quotation marks omitted).

Here, Defendants do not dispute that Plaintiff, who is African-American, has alleged that he is a member of a protected class, that he was qualified for his position as an SEA in the Department, and that he suffered an adverse employment action, namely, his termination. Defendants argue that Plaintiff has failed to plausibly allege that his termination was motivated by racial discrimination because Plaintiff has failed to plausibly allege that "he was treated more harshly than [white employees in the Department] and otherwise disadvantaged with respect to his employment[] as compared to [those] employees." (Defs.' Mem. 20.) The Court will

therefore focus on whether there are sufficient allegations that give "plausible support to a minimal inference of discriminatory motivation" for the adverse action. *Littlejohn*, 795 F.3d at 311.

"An inference of discrimination can arise from circumstances including, but not limited to, the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's discharge." *Id.* at 312 (citation and quotation marks omitted). Here, Plaintiff does not allege that any Defendant used language "directly indicat[ing] racial bias." *Id.* "[A] plaintiff alleging discrimination based on disparate disciplinary treatment," as here, "must demonstrate that [he] was subject to an adverse employment action and that a similarly situated employee not in the relevant protected group received better treatment." *Campbell v. County of Onondaga*, No. 04-CV-1007, 2009 WL 3163498, at *15 (N.D.N.Y. Sept. 29, 2009) (citation and quotation marks omitted). It must be alleged that the plaintiff "was similarly situated in all material respects to the individuals with whom [the plaintiff] seeks to compare [himself]." *Jenkins v. St. Luke's-Roosevelt Hosp. Ctr.*, No. 09-CV-12, 2009 WL 3682458, at *7 (S.D.N.Y. Oct. 29, 2009) (citation and quotation marks omitted); *see also Mandell v. County of Suffolk*, 316 F.3d 368, 379 (2d Cir. 2003) (same). Courts consider, among other factors, (1) "whether the plaintiff" and the putative comparators "were similarly situated were subject to the same workplace standards"; and (2) "whether the conduct for which the employer imposed discipline was of comparable seriousness." *Jenkins*, 2009 WL 3682458, at *7 (citation omitted). "[A]lthough, at the motion to dismiss stage, evidence of similarly situated comparators is not necessary, a court still must determine whether, based on a plaintiff's allegations . . . , it is plausible that a jury could

ultimately determine that the comparators are similarly situated." *Weslowski v. Zugibe*, 14 F. Supp. 3d 295, 319 (S.D.N.Y. 2014) (citation, alterations, and quotation marks omitted); *see also McDowell v. N. Shore-Long Isl. Jewish Health Sys., Inc.*, 839 F. Supp. 2d 562, 569 (E.D.N.Y. 2012) (noting that a plaintiff must allege that "he was punished more severely than those outside of his racial class who were similarly situated in all material respects, and the severity of that punishment is related to his race").

Here, Plaintiff broadly alleges that the events of early 2017, which culminated in his termination in June 2017, were racially discriminatory.[11]  In particular, Plaintiff alleges that, in February 2017, he was assigned to be a field site inspector for a large project (the "Project"), on which Defendant Dutcavich was the supervisor.  (Am. Compl. ¶¶ 60(a)–(b).)  The outside contractor with whom the County was working on the Project provided substandard conditions for Plaintiff at the Project site.  (*Id.* ¶ 60(c).)  Plaintiff repeatedly complained about these issues to Dutcavich, and in so doing "emphasiz[ed] that his [w]hite colleagues would not be ignored if they complained of such deficiencies" and that Dutcavich's "failure [to] . . . address the worksite deficiencies . . . was discriminatory"; yet Dutcavich did nothing.  (*Id.* ¶¶ 60(d)–(e).)  On April 3, 2017, Plaintiff visited the County's EEO Counselor to discuss lodging a formal complaint of racial discrimination against Dutcavich.  (*Id.* ¶ 61.)  On April 14, 2017, Dutcavich wrote the allegedly false and pretextual April 14 Memorandum regarding a conversation the two had, and

---

[11] Plaintiff has clarified that, as to the allegations in the Amended Complaint regarding hiring, overtime, and promotions, he "included [those] allegations to illustrate the pattern and practice of discrimination that is statistically documented in the [2013 Analysis]" and because they "provide context for [Plaintiff's] hostile work environment claim."  (Pl.'s Mem. 15.)  The Court therefore does not construe Plaintiff's (counseled) allegations as including a disparate treatment claim based on discriminatory hiring, overtime, and promotions.  Rather, as Defendants state, without opposition, "Plaintiff's disparate treatment claims are . . . explained as only involving his termination."  (Defs.' Reply 5.)

"inexplicably" sent a copy of the Memorandum to Defendant Balkind, the Department head. (*Id.* ¶¶ 63–65; April 14 Memorandum.) On April 23, 2017, Plaintiff filed an EEOC Complaint and sent copies to Dutcavich and Balkind. (Am. Compl. ¶ 70(c).) On April 24, 2017, Balkind sent Plaintiff a letter, dated April 20, 2017, "summoning [him] to a meeting in his office" on grounds that "an unnamed source had," beginning April 4, 2017 — the day after Plaintiff's meeting with the EEO Counselor — "photographed [Plaintiff's] County vehicle parked at his home during work hours." (*Id.* ¶¶ 66–67; Balkind Letter.) Plaintiff had never before "been summoned to a meeting in the Commissioner's office," and indeed "had never been counseled, warned[,] or . . . reprimand[ed] for misconduct of any kind." (Am. Compl. ¶ 68.) Accordingly, Plaintiff suspected that the County car issue was "pretext" and in fact Balkind "knew of [Plaintiff's] . . . complaints of discrimination." (*Id.* ¶¶ 69–70.) Plaintiff did not attend the meeting with Balkind, and instead sent emails and letters to Dutcavich and Balkind describing various instances of alleged racial discrimination and retaliation he had suffered over the course of his time with the Department. (*Id.* ¶¶ 70(d)–(e), 71–72; Defs.' Decl. Ex. D, at 11 (April 27, 2017 letter from Balkind to Plaintiff stating that they "had a meeting scheduled . . . to discuss why the County vehicle [Plaintiff] was assigned . . . was seen at [Plaintiff's] home . . . and to inform [Plaintiff] of the Department's expectations when using a County vehicle").) Plaintiff also filed a supplement to his formal EEOC Complaint and sent a copy to Balkind. (*Id.* ¶ 70(f).) On May 19, 2017, Balkind charged Plaintiff with "insubordination" on the ground that Plaintiff "refus[ed] to attend" the April 27, 2017 meeting, and recommended that Plaintiff be fired. (*Id.* ¶¶ 71–72.) Plaintiff was thereafter found guilty of the insubordination charge and, in June 2017, was terminated. (Defs.' Decl. Ex. S (letter of termination); *see also* Pl.'s Mem. 13 (acknowledging termination in June 2017 and arguing that, "[a]ccording to the County, [Plaintiff] was fired

because he refused to attend a counseling session with . . . Balkind, and wrote letters that . . . Balkind viewed as 'caustic'").

As noted, Plaintiff does not allege that Balkind or Dutcavich (or anyone else) used racially derogatory language or otherwise conducted themselves in an overtly racially discriminatory manner.  Rather, Plaintiff alleges that his termination was racially discriminatory because Balkind — notwithstanding that this was Plaintiff's first offense and that Plaintiff was a "superior" employee who maintained a positive reputation in the Department — ignored the County's "policies favoring progressive discipline" and "treated [Plaintiff] less favorably than other non-minority, similarly situated employees because [Plaintiff] had accused . . . Balkind and the County of discrimination."  (Am. Compl. ¶ 73; Pl.'s Mem. 12–14.)  Plaintiff also argues that Balkind's explanation for Plaintiff's termination was "implausible, inconsistent, contradictory[,] and unworthy of belief," thus "raising an inference of discrimination."  (Pl.'s Mem. 13.)

Critically, however, Plaintiff fails to identify any comparators at all, let alone any comparator employee in the Department who was disciplined or otherwise treated differently than he was under similar circumstances.  *See Blige v. City Univ. of New York*, No. 15-CV-8873, 2017 WL 498580, at *9 (S.D.N.Y. Jan. 19, 2017) ("Numerous courts within the Second Circuit have granted motions to dismiss disparate treatment claims where the complaint was entirely devoid of any details regarding . . . how [the putative comparators'] conduct compared to plaintiffs' or how they were treated differently by defendants." (citations, quotation marks, and alterations omitted)), *adopted by* 2017 WL 1064716 (S.D.N.Y. Mar. 21, 2017).  For example, although Plaintiff argues that the Balkind Letter was pretextual because "County employees are allowed to use their [C]ounty cars to go to lunch during their work shift," (Pl.'s Mem. 14), Plaintiff fails to allege an example of another employee who did so and was not disciplined (or

received different discipline). Nor does Plaintiff allege an example of another employee who failed to attend a meeting with the Commissioner or otherwise received lesser discipline for a similar offense pursuant to the County's alleged policy of progressive discipline. Indeed, Plaintiff does not identify any other instance of employee discipline (or lack thereof). To the extent Plaintiff relies on the 2013 Analysis showing racial imbalances in the County workforce, and in particular imbalances in minority hiring and promotions, the cited statistics are not alleged to indicate racial imbalances in employee *discipline*. Moreover, "generic allegation[s] of disparate treatment related to an unspecified class of Caucasian persons is simply not sufficient." *Sosa v. N.Y.C. Dep't of Educ.*, 368 F. Supp. 3d 489, 499 (E.D.N.Y. 2019) (citation omitted).

The Court thus concludes that Plaintiff fails to allege disparate treatment that could plausibly support an inference of racial discrimination. *See Ruiz v. County of Rockland*, 609 F.3d 486, 495 (2d Cir. 2010) ("Because [the plaintiff] has not identified a similarly-situated employee who faced equally serious allegations and whom [the employer] allowed to remain on the job, [the plaintiff] has failed to raise an inference of discrimination."); *Morales v. Bottling Grp., LLC*, 374 F. Supp. 3d 257, 269 (W.D.N.Y. 2019) (dismissing disparate treatment claim where the plaintiff did "not identif[y] any comparator who was treated more favorably than him, instead alleging that management 'treated minority employees differently than Caucasian employees,' and subjected minorities to 'unequal terms, conditions, and privileges of employment as compared to non-minority employees'" (citation and alterations omitted)); *Senese v. Longwood Cent. Sch. Dist.*, 330 F. Supp. 3d 745, 768 (E.D.N.Y. 2018) ("The [p]laintiff's failure to identify a similarly situated employee who faced similar accusations, but were permitted by the [employer] to remain employed[,] precludes an inference of discrimination." (citations omitted)). Accordingly, Plaintiff's disparate treatment claim is

dismissed.  *See Henry v. NYC Health & Hosp. Corp.*, 18 F. Supp. 3d 396, 408 (S.D.N.Y. 2014) (dismissing disparate treatment claim where the plaintiff "fail[ed] to describe who [the alleged comparators] are, what their responsibilities were, how their workplace conduct compared to [hers], or how they were treated"); *see also Chan v. N.Y. Univ. Downtown Hosp.*, No. 03-CV-3003, 2006 WL 345853, at *5–6 (S.D.N.Y. Feb. 14, 2006) (granting summary judgment on disparate treatment claim where the plaintiff failed to identify similarly situated employees).

## 2.  Hostile Work Environment

To state a hostile work environment claim, a plaintiff must meet the "high bar," *Duplan v. City of New York*, 888 F.3d 612, 627 (2d Cir. 2018), of pleading conduct that "(1) is objectively severe or pervasive — that is, creates an environment that a reasonable person would find hostile or abusive; (2) creates an environment that the plaintiff subjectively perceives as hostile or abusive; and (3) creates such an environment because of the plaintiff's [protected status]," *Patane v. Clark*, 508 F.3d 106, 113 (2d Cir. 2007) (citation, alterations, and quotation marks omitted).  The same standard is used regardless of whether the allegations are brought pursuant to § 1983, Title VII, or the NYSHRL.  *See Turley v. ISG Lackawanna, Inc.*, 774 F.3d 140, 151 n.6 (2d Cir. 2014); *Smith v. Town of Hempstead Dep't of Sanitation*, 798 F. Supp. 2d 443, 451 (E.D.N.Y. 2011).  In evaluating a hostile work environment claim, the Court considers "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993); *see also Ruiz v. City of New York*, No. 14-CV-5231, 2015 WL 5146629, at *8 (S.D.N.Y. Sept. 2, 2015) (same).  The actions taken by the employer "must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive."  *Alfano v. Costello*, 294

F.3d 365, 374 (2d Cir. 2002) (citation and quotation marks omitted). The Second Circuit "treats the first two of these factors — the frequency and the severity of the misconduct — as the principal focus of the analysis." *Aulicino v. N.Y.C. Dep't of Homeless Servs.*, 580 F.3d 73, 82 (2d Cir. 2009). "Core hostile work environment cases involve misconduct that is both frequent and severe, for example, when a supervisor utters blatant racial epithets on a regular if not constant basis and behaves in a physically threatening manner." *Id.* (citation and quotation marks omitted). Finally, "[i]t is axiomatic that the plaintiff also must show that the hostile conduct occurred because of a protected characteristic." *Richards v. N.Y.C. Dep't of Educ.*, No. 13-CV-16, 2015 WL 4164746, at *10 (S.D.N.Y. July 10, 2015) (citations and quotation marks omitted).

Defendants argue that Plaintiff fails to allege any facts demonstrating frequent and severe racially discriminatory conduct. (Defs.' Mem. 6–7, 18–19.) The Court agrees.

Plaintiff argues, in conclusory fashion, that the Amended Complaint contains "ample allegations of racial hostility" faced by Plaintiff over his ten years of employment in the Department, in particular, the "racially charged events of March through May of 2017, when the racial hostility directed at [Plaintiff] culminated in" his termination in June 2017. (Pl.'s Mem. 23–24.) In fact, the Amended Complaint is almost entirely devoid of facts plausibly suggesting a racially hostile work environment.

Plaintiff alleges that, upon being hired in 2007, he was told by the Director of Engineering, with whom he had a "frank" relationship, "to expect 'resistance' from his coworkers because of his color.'" (Am. Compl. ¶ 58.) Soon thereafter, Plaintiff alleges, (1) he was "isolated" by his supervisor by not being placed in a small assignment group; (2) his planned training session was cancelled when his "co-workers declined to attend"; and (3) another

employee "yelled rudely at [him]" while he was "walking through the facility garage," demanding to know who [Plaintiff] was and why he was there" and "to see [Plaintiff's] identification." (*Id.* ¶¶ 59(a)–(c).) Plaintiff next alleges that white employees were favored over minority employees in awarding overtime opportunities. (*Id.* ¶ 46.) For example, in November 2016, Dutcavich rejected Plaintiff's request to work overtime on Veteran's Day and instead assigned Shatalaov, a white employee who had already been given overtime on Election Day, the work. (*Id.* ¶¶ 47, 49(f).) Plaintiff also alleges that white employees were favored over minority employees in promotion, (*id.* ¶¶ 48–50), and that he never received a promotion despite his extensive field experience, wide skill set, and positive departmental reputation, (*id.* ¶¶ 50, 55, 57(b)). Finally, Plaintiff alleges that, in March 2017, he repeatedly complained to Dutcavich about the worksite conditions at the Project provided by the outside contractor, and "emphasiz[ed] that his [w]hite colleagues would not be ignored if they complained of such deficiencies." (*Id.* ¶¶ 60(d)–(e).) Notwithstanding Plaintiff's complaints, Dutcavich did nothing. (*Id.*) Instead, Dutcavich wrote the allegedly false and pretextual April 14 Memorandum and sent a copy to Balkin, (*id.* ¶¶ 63–65), thus setting in motion the chain of events that would lead to Plaintiff's termination.

Nowhere in Plaintiff's allegations, however, does he allege facts plausibly suggesting that any Defendant (or anyone else in the Department) used racially derogatory language or acted in an overtly racially discriminatory way. The Court therefore concludes, "[l]ooking at all the circumstances," that the specific "incidents of which Plaintiff complains together are insufficiently severe or pervasive to rise to the level of a hostile work environment." *Davis v. N.Y. Dep't of Corr.*, 256 F. Supp. 3d 343, 353 (S.D.N.Y. 2017). At best, Plaintiff has alleged "sporadic or episodic incidents" of racially discriminatory conduct. *Wright v. Stern*, 450 F.

Supp. 2d 335, 372 (S.D.N.Y. 2006). Plaintiff has failed to allege facts plausibly suggesting that the Department maintained a "systemic culture of [racial] harassment." *Id.* Indeed, Plaintiff's allegations fall short when compared to those allegations which courts have held insufficient to state a hostile work environment claim. *See Ahmad v. White Plains City Sch. Dist.*, No. 18-CV-3416, 2019 WL 3202747, at *8 (S.D.N.Y. July 16, 2019) (dismissing hostile work environment claim where the plaintiff alleged "isolated incidents" of troubling comments by school administrators, such as "we don't like colored people in the department"); *Ariz v. Metro. Transp. Auth.*, No. 17-CV-4491, 2019 WL 2613476, at *6 (S.D.N.Y. June 26, 2019) (dismissing hostile work environment claim where the plaintiff alleged "two race-based comments by a coworker and unspecified 'microaggressions'"); *Harrison v. State Univ. of N.Y. Downstate Med. Ctr.*, No. 16-CV-1101, 2018 WL 4055278, at *11–12 (E.D.N.Y. July 6, 2018) (dismissing hostile work environment claim where the plaintiff "complain[ed] of five extremely unpleasant interactions" and uncertainty about requested sick leave "over the course of a week, and several weeks of uncertainty regarding whether her sick leave actually had been approved" (footnote omitted)), *adopted by* 2018 WL 4054868 (E.D.N.Y. Aug. 24, 2018); *Guy v. MTA N.Y.C. Transit*, No. 15-CV-2017, 2016 WL 8711080, at *8 (E.D.N.Y. Sept. 23, 2016) (dismissing hostile work environment claim where the plaintiff "simply identifies a series of incidents in his complaint," but "fails to allege any facts that would show that the conduct of which he complains is objectively severe and pervasive"); *cf. Zoulas v. N.Y.C. Dep't of Educ.*, 18-CV-2718, 2019 WL 4090057, at *21 (S.D.N.Y. Aug. 29, 2019) (declining to dismiss hostile work environment claim where the "complaint describe[d] numerous specific, concerted, and continuous allegations of harassment and ridicule based on [the plaintiff's] age over the course of multiple years"). Accordingly, Plaintiff's hostile work environment claim is dismissed.

### 3. Retaliation

Title VII's anti-retaliation provision prohibits an employer from "discriminat[ing] against any of his employees . . . because [the employee] has opposed any practice made an unlawful employment practice by this subchapter."  42 U.S.C. § 2000e-3(a).  In other words, "Title VII forbids an employer to retaliate against an employee for . . . complaining of employment discrimination prohibited by Title VII."  *Kessler v. Westchester County Dep't of Soc. Servs.*, 461 F.3d 199, 205 (2d Cir. 2006).  Thus, "for a retaliation claim to survive . . . a motion to dismiss, the plaintiff must plausibly allege that: (1) defendants discriminated — or took an adverse employment action — against him, (2) 'because' he has opposed any unlawful employment practice."  *Vega*, 801 F.3d at 90 (citation omitted).  Retaliation claims under § 1983 and the NYSHRL are subject to the same standard.  *See Goonewardena v. N.Y. Workers Comp. Bd.*, 258 F. Supp. 3d 326, 343–44 (S.D.N.Y. 2017) (treating retaliation claims under Title VII, § 1983, and the NYSHRL under the same standard).

Defendants do not appear to dispute that Plaintiff was engaged in protected activity about which the Department was aware, (*see* Defs.' Mem. 23–26), and for good reason.  Plaintiff alleges that, in late March and early April 2017, he complained about worksite issues at the Project directly to Dutcavich, the Project supervisor, and "emphasiz[ed] that his [w]hite colleagues would not be ignored if they complained of such deficiencies."  (Am. Compl. ¶¶ 60(d)–(e), ¶ 70(a).)  This informal complaint of racial discrimination constitutes protected activity.  *See LaFontant v. Neale*, No. 18-CV-23, 2019 WL 1953942, at *7 (S.D.N.Y. May 2, 2019) (holding that the "[p]laintiff's [oral] complaint to [her supervisor] plausibly constitutes protected activity of which [the employer] was aware" (collecting cases)).  Plaintiff also alleges that, on April 3, 2017, he spoke with the County's EEO Counselor and that, on April 23, 2017,

he filed the first of two EEOC complaints against Dutcavich and Balkind. (Am. Compl. ¶¶ 61, 70(c), 74.) These formal complaints also constitute protected activity. *See Dawson v. Long*, No. 16-CV-1608, 2018 WL 4519199, at *3 (S.D.N.Y. Sept. 20, 2018) (holding that the "[p]laintiff also engaged in protected activity when he spoke to the EEO counselor . . . and when he filed his [EEOC Complaint]"); *Brooks v. Blank*, No. 10-CV-8124, 2014 WL 1495774, at *13 (S.D.N.Y. Mar. 31, 2014) (holding that "contact with the EEO counselor was protected activity" (citation omitted)).

Defendants also do not contest that Plaintiff suffered an adverse employment action, for Balkind's termination of Plaintiff in June 2017, (*see* Am. Compl. ¶¶ 71–73; Defs.' Decl. Ex. S (letter of termination)), clearly constitutes adverse employment action, *see Jones v. Target Corp.*, No. 15-CV-4672, 2016 WL 50779, at *8 (E.D.N.Y. Jan. 4, 2016) (holding that "termination is an adverse action for purposes of retaliation claims pursuant to Title VII" (collecting cases)).

Rather, Defendants argue that Plaintiff fails to allege a plausible causal connection between his protected activity and termination. (Defs.' Mem. 23–26.) The Court disagrees. A plaintiff can demonstrate causal connection, as relevant here, "indirectly, by showing that the protected activity was followed closely by discriminatory treatment." *Gordon v. N.Y.C. Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000); *see also Richardson v. Bronx Lebanon Hosp.*, No. 11-CV-9095, 2014 WL 4386731, at *12 (S.D.N.Y. Sept. 5, 2014) (same). "Though [the Second Circuit] has not drawn a bright line defining, for the purposes of a prima facie case, the outer limits beyond which a temporal relationship is too attenuated to establish causation, [it has] previously held that five months is not too long to find the causal relationship." *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 110 (2d Cir. 2010) (citation omitted). Here, as described above, Plaintiff alleges a two- to three-month gap between his engaging in protected activity in

March and April 2017 and his termination in June 2017.  This gap is sufficiently narrow, at the motion-to-dismiss stage, to satisfy the requisite causal connection.  *See Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Educ.*, 444 F.3d 158, 168 (2d Cir. 2006) ("[T]he lapse of only several months after the letter and several weeks after the press conference between the protected speech and the adverse employment action is sufficient to support an allegation of a causal connection strong enough to survive summary judgment." (collecting cases)); *Garcia v. Yonkers Bd. of Educ.*, No. 15-CV-767, 2018 WL 4007648, at *7 (S.D.N.Y. Aug. 21, 2018) (collecting cases and holding that a period of three months "would, alone, be enough to meet a causal connection"); *Murray v. Visiting Nurse Servs. of N.Y.*, 528 F. Supp. 2d 257, 275 (S.D.N.Y. 2007) (same).

In response, Defendants argue that Plaintiff cannot establish the requisite causal connection because the disciplinary proceedings that led to his termination were already in progress when he engaged in protected activity about which Defendants knew.  (Defs.' Mem. 24.)  It is true, of course, "that an adverse employment action cannot serve as the basis for a retaliation claim if the action was set in motion before a plaintiff engaged in protected activity." *Wilkinson v. Nord Anglia Educ. Ltd.*, No. 17-CV-7421, 2019 WL 3430662, at *10 (S.D.N.Y. July 30, 2019) (collecting cases); *see also Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 272 (2001) ("Employers need not suspend previously planned transfers upon discovering that a Title VII suit has been filed, and their proceeding along lines previously contemplated, though not definitely determined, is no evidence whatsoever of causality.").  In Defendants' view, at the time Balkind sent Plaintiff the letter, dated April 20, 2017 and received by Plaintiff on April 24, 2017, demanding a meeting purportedly to discuss the misuse-of-car issue and indicating the possibility of discipline, Balkind was not aware of Plaintiff's protected activity, for he did not receive notice of Plaintiff's EEOC Complaint and earlier meeting with the EEO Counselor until

April 26, 2017. (Defs.' Mem. 24.) In other words, according to Defendants, Plaintiff's discipline was already in progress at the time Balkind was made aware of Plaintiff's EEOC Complaint.

There are two problems with Defendants' argument. First, Defendants miss that Plaintiff has squarely alleged that he first engaged in protected activity about which the Department knew in late March and early April 2017, when he allegedly repeatedly complained to Dutcavich about the discriminatory conditions at his worksite, (Am. Compl. ¶ 60(d)–(e)), some two or three weeks *prior* to the Balkind Letter.

Second, on the merits, it is not at all clear that Defendants' conception of the Balkind Letter is a fair one. The Letter only scheduled "a meeting to discuss" Plaintiff's alleged misuse of a County car and stated that "this discussion may lead to disciplinary actions against you." (Balkind Letter.) The plain terms of the letter thus indicate that discipline was not yet in motion, but was still only a future possibility. *Cf. Brown v. Xerox Corp.*, 170 F. Supp. 3d 518, 530 (W.D.N.Y. 2016) (granting summary judgment on retaliation claim where the evidence showed that "the decision had already been made to remove [the plaintiff] from his position" at the time the plaintiff engaged in protected activity). Further, the Balkind Letter states that surveillance of Plaintiff's home began on April 4, 2017. (Balkind Letter.) As Plaintiff alleges, this timing — one day after Plaintiff met with the EEO Counselor — may suggest that Balkind did in fact know of Plaintiff's protected activity at the time he sent the Letter. (Am. Compl. ¶¶ 67, 70(d); Pl.'s Mem. 21.)

In sum, while it is true that "[a]n employer should not be required to put a previously-planned, legitimate employment decision on hold simply because an employee engaged in protected activity," *Cayemittes v. City of N.Y. Dep't of Hous. Pres. & Dev.*, 974 F. Supp. 2d 240,

263 (S.D.N.Y. 2013), *aff'd*, 641 F. App'x 60 (2d Cir. 2016), it is not clear from the Amended Complaint and the other documents which the Court has considered that that is what happened here. *See Wilkinson*, 2019 WL 3430662, at *10–11 (denying summary judgment on retaliation claim where the evidence did not "compel" the conclusion that the employer had decided to terminate the employee prior to the protected activity); *cf. Lolonga-Gedeon v. Child & Fam. Servs.*, 106 F. Supp. 3d 331, 338 (W.D.N.Y. 2015) (granting summary judgment on retaliation claim where "there [was] no issue of material fact that [the defendant's] audit of [the plaintiff's] educational credentials began well before" the plaintiff engaged in protected activity). Accordingly, the Court concludes that Plaintiff plausibly states a retaliation claim. Defendants remain free to raise the issue again on a more fully developed record at a later stage.

### 4. Conspiracy

Plaintiff alleges that Balkind, Dutcavich, and Dewitt conspired to discriminate against him on the basis of his race, in violation of 42 U.S.C. § 1985(3). (Am. Compl. ¶ 102.)

To make out a conspiracy claim under § 1985(3), a Plaintiff must allege: "(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of equal protection of the laws[;] (3) an act in furtherance of the conspiracy; (4) whereby a person is deprived of any right of a citizen of the United States." *Demosthene v. City of New York*, No. 14-CV-816, 2019 WL 3992868, at *5 (E.D.N.Y. Aug. 16, 2019) (citation, quotation marks, and alterations omitted). Further, a plaintiff must make "a showing of class-based invidiously discriminatory animus" on the part of the conspiring parties, *Hickey v. City of New York*, No. 01-CV-6506, 2004 WL 2724079, at *22 (S.D.N.Y. Nov. 29, 2004) (citation omitted), *aff'd*, 173 F. App'x 893 (2d Cir. 2006), as well as provide "some factual basis supporting a meeting of the minds, such that [the] defendants entered into an agreement, express or tacit, to

achieve the unlawful end," *Webb v. Goord*, 340 F.3d 105, 110 (2d Cir. 2003) (citation and quotation marks omitted). "Claims of conspiracy that are vague and provide no basis in fact must be dismissed." *Germain v. M & T Bank Corp.*, 111 F. Supp. 3d 506, 540 (S.D.N.Y. 2015) (citation, quotation marks, and alterations omitted).

Here, Plaintiff alleges that Balkind, Dutcavich, and Dewitt together conspired against him. (Am. Compl. ¶ 103.) In particular, Plaintiff alleges that, in 2016, Dutcavich rejected Plaintiff's request for overtime and instead gave it to Shatalov, a white male coworker; that Dutcavich failed to remedy the worksite conditions at the Project despite Plaintiff's repeated complaints of discrimination; that Plaintiff met with an EEO Counselor, the day after which Balkind placed Plaintiff's house under surveillance; that Dutcavich wrote the allegedly false and pretextual April 14 Memorandum and then "inexplicably" sent a copy to Balkind; that Plaintiff thereafter filed the EEOC Complaint and sent copies to Dutcavich, Balkind, and Dewitt; that Dewitt, the County's Union Shop Steward, told Plaintiff that he could not represent him because the Union had to represent Dutcavich against Plaintiff's discrimination charge; that Balkind summoned Plaintiff to a meeting on an allegedly pretextual ground; and that, after Plaintiff failed to attend the meeting, Balkind charged Plaintiff with insubordination and then terminated him. (*Id.* ¶¶ 63–65, 71–76; *see also* Pl.'s Mem. 25–28.)

These allegations contain no plausible suggestion that Balkind, Dutcavich, and Dewitt formed a conspiratorial agreement, whether express or implicit, let alone formed such an agreement with the intent to discriminate against Plaintiff because of his race. "[T]hat Defendants may have interacted with each other to some degree" does not plausibly suggest "that they entered into an agreement to deprive Plaintiff of his civil rights." *Velez v. City of New York*, No. 17-CV-9871, 2019 WL 3495642, at *5 (S.D.N.Y. Aug. 1, 2019). Indeed, Balkind and

Dutcavich are not alleged to have interacted with Dewitt at all. Accordingly, the Court dismisses Plaintiff's conspiracy claim. *See Kendrick v. Troche*, No. 18-CV-6932, 2019 WL 4072754, at *3 (W.D.N.Y. Aug. 29, 2019) (dismissing § 1985 conspiracy claim where "there [were] no allegations . . . to suggest that the conspiracy entered into . . . was motivated by some racial or other 'class-based invidious discriminatory animus'" (citation omitted)); *Cox v. City of New Rochelle*, No. 17-CV-8193, 2019 WL 3778735, at *6 (S.D.N.Y. Aug. 12, 2019) (collecting cases dismissing § 1983 conspiracy claims where no conspiratorial agreement was plausibly alleged); *Cianfano v. Vill. of Tuckahoe*, No. 18-CV-7882, 2019 WL 3456887, at *6 (S.D.N.Y. July 31, 2019) (collecting cases dismissing § 1985 conspiracy claims where no conspiratorial agreement was plausibly alleged).

### III. Conclusion

For the foregoing reasons, Defendants' Motion To Dismiss is granted in part and denied in part. Plaintiff's claims of disparate treatment, hostile work environment, and conspiracy are dismissed. Plaintiff's claim of retaliation remains, as does his (unchallenged) claim of disparate impact.

The claims that are dismissed are dismissed without prejudice. If Plaintiff wishes to file a second amended complaint, Plaintiff must do so within 30 days of the date of this Opinion. Plaintiff should include within that second amended complaint all changes to correct the deficiencies identified in this Opinion that Plaintiff wishes the Court to consider. Plaintiff is further advised that the second amended complaint will replace, not supplement, all prior complaints and filings. The second amended complaint must contain *all* of the claims, defendants, factual allegations, and exhibits that Plaintiff wishes the Court to consider. If Plaintiff fails to abide by the 30-day deadline, his claims may be dismissed with prejudice and

the case will proceed on the remaining claims.

Should Plaintiff wish to proceed against Molinaro in his individual capacity or against Dewitt, the Court directs Plaintiff to complete service within 30 days of the date of this Opinion, or they will be dismissed.

The Clerk of Court is directed to amend the caption to substitute Dutchess County as a defendant in place of "Dutchess County Executive Branch." *See* Fed. R. Civ. P. 21.

The Clerk of the Court is respectfully requested to terminate the pending Motion. (Dkt. No. 29.)

SO ORDERED.

DATED:     September **25**, 2019
              White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE